**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **M.C.F.**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**FAIRFAX CRYOBANK, INC.**,<br><br>Defendant. | Case No. ____________________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff M.C.F. ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Fairfax Cryobank, Inc. ("Fairfax Cryobank" or "Defendant"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Information concerning an individual's health, especially reproductive health, is among the most sensitive, and closely guarded information in our society. An individual's struggle with infertility is deeply personal, and involves intimate medical details, family planning decisions, and highly personal circumstances that individuals may reasonably wish to keep private.

2. The unwanted disclosure of such information can be enormously harmful. It can result in emotional distress, discrimination in the workplace, and denial of insurance coverage.

And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical and reproductive care when they need it most.

3. Fairfax Cryobank is a reproductive tissue bank that specializes in the collection, processing, storage, and distribution of donor sperm for use in assisted reproductive procedures. Fairfax Cryobank boasts that its team of genetic counselors and client-service experts combine advanced testing with empathy to ensure that its clients, who range from single parents to LGBTQ+ couples, receive support and respect on their journey of creating their family.[1]

4. Through the Fairfax Cryobank website - https://fairfaxcryobank.com/ - (the "Website"), prospective parents can explore Fairfax Cryobank's storage and testing services, search donor profiles, add donors to their favorites list, purchase donor sperm.

5. Unfortunately, unbeknownst to Plaintiff and other visitors to the Website, their private personal and health information was not actually being kept private. Instead, through the Website, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiff's and other prospective parents' fertility goals, including the services they are seeking; the filters they applied when searching for donors (e.g., height); the donors they viewed, added to their favorites list, and added to their carts; and the fact that they called a client services representative from Fairfax Cryobank (collectively, "Sensitive Information") to unauthorized third parties, including Alphabet, Inc. ("Google"), Meta Platforms, Inc. ("Facebook"), and Pinterest, Inc. ("Pinterest" and with Google and Facebook, the "Tracking Tool Providers"), through the use of surreptitious online tracking tools.

---

[1] *See About Fairfax Cryobank*, FAIRFAX CRYOBANK, https://fairfaxcryobank.com/about-fairfax-cryobank (last visited Oct. 28, 2026).

6. Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used to fuel for a massive, targeted advertising enterprise.

7. Thus, any information about a person captured by the Tracking Tool Providers can be used to stream ads to that person, among other uses. If, for example, a Tracking Tool Provider receives information that a person is seeking fertility treatments, it will collect that information and allow its clients to use that information to stream ads related to family planning and baby products and services to that person's computers and smartphones.

8. The Tracking Tool Providers offer website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager*; Facebook's *Meta Business Suite* and *Facebook Ads* products; and Pinterest's *Pinterest Ads* and the *Pinterest Tag* (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage the Tracking Tool Providers' enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

9. The Tracking Tool Providers' massive databases of consumer information can only exist with the help of users of the Business Tools, like Defendant. To use any one of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Providers' internet surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools"). For example, if a website operator wishes to use, e.g., Google Analytics, it must install Google's Tracking Tools onto its website. After being installed, the

Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer. Moreover, this sensitive information often includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.

10. In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in their mass surveillance networks and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their website users' privacy.

11. Defendant Fairfax Cryobank chose to accept this bargain by installing the Tracking Tool Providers' Tracking Tools on its Website. In doing so, it has chosen to prioritize marketing over customer privacy.

12. Plaintiff and Class Members visited the Website and had their personal Sensitive Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Information with third parties. At all relevant times to this action, Plaintiff and Class Members gave no informed consent for their Sensitive Information to be transmitted to third parties, including to some of the largest advertisers and compilers of user information.

13. Health information is regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an

individual[.]"[2] Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information constitutes a violation of HIPAA.

14. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Information.

15. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy; Negligence; Breach of Fiduciary Duty; Breach of Confidence; Breach of Implied Contract; Unjust Enrichment; and violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.

## II. PARTIES

***Plaintiff M.C.F.***

16. Plaintiff M.C.F. is a citizen of the State of Texas, residing in Harris County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17. In or around October 2024, Plaintiff M.C.W. first utilized the Website on her personal electronic device to search donor profiles and add donors to her favorites list or cart, in the same manner as depicted in §IV(d), *infra*. Plaintiff M.C.W. subsequently purchased donor sperm from Defendant in October 2025.

[2] 18 U.S.C. § 1320d-(6).

18. Unbeknownst to Plaintiff M.C.W., the Website transmitted the Sensitive Information that she input into the Website, including the services she was interested in and the donors she searched for, viewed, and added to her favorites list or cart.

19. Plaintiff M.C.W. never authorized Fairfax Cryobank to disclose any aspect of her communications with it through the Website to third parties, including the Sensitive Information that she provided through the Website.

20. On every occasion that she visited the Website, Plaintiff M.C.W. possessed accounts with Google, Facebook, and Pinterest, and she accessed the Website while logged into her accounts on the same device.

21. After providing her Sensitive Information to Defendant through the Website, Plaintiff M.C.W. immediately began seeing targeted online advertisements related to family planning.

***Defendant Fairfax Cryobank, Inc.***

22. Defendant Fairfax Cryobank is a Virginia corporation with its principal place of business at 3015 Williams Dr., Fairfax, VA 22031 in Fairfax County.

## III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because many putative class members are citizens of a different state than Defendant, including Plaintiff. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental

jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

24. This Court has personal jurisdiction over Defendant because it has availed itself of the rights and benefits of the State of Texas, including by (1) providing services in this District, including through its two locations in Austin, Texas and Houston, Texas;[3] (2) conducting substantial business in this District, including, but not limited to, business with Plaintiff, and (3) perpetuating unlawful acts in this District..

25. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because: a substantial part of the events giving rise to this action occurred in this District; Defendant collects and redistributes Class Members' Sensitive Information in this District; and Defendant caused harm to Class Members residing in this District.

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i. The Tracking Tool Providers' Mass Advertising Surveillance Operations

26. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's

---

[3] *Locations*, FAIRFAX CRYOBANK, https://fairfaxcryobank.com/locations (last visited Oct. 28, 2026).

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively; *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIAM, https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Oct. 28, 2026).

advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

27. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "access Google's unique insights."[6] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

28. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

29. Google also admits that it uses the information collected from third party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

---

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sept. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Oct. 28, 2026).

[6] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Oct. 28, 2026).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Oct. 28, 2026).

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Oct. 28, 2026).

[9] *Id*.

30. Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[10]

31. Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[11]

32. But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that information to sell targeted advertising.[12] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[13]

33. Pinterest operates a social media platform that allows users to discover, save, and share images, videos, and other content, follow topics and creators, and find ideas and products relevant to their interests. Pinterest generates the vast majority of its revenue through digital

---

[10] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Oct. 28, 2026).

[11] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last visited Oct. 28, 2026).

[12] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last visited Oct. 28, 2026).

[13] *Id.*

advertising on its platform. In 2025, Pinterest generated approximately $4.22 billion in revenue, "substantially all" of which derives from advertising.[14]

34. Pinterest promotes its "Pinterest Tag" to website operators, like Defendant, claiming that it allows them to "track visitors to [their] site[s], as well as the actions they take" to track and optimize conversions and build audiences for targeting.[15]

35. Like Google and Facebook, Pinterest requires website operators seeking to benefit from its data collection to install its Business Tools on their websites. Indeed, Pinterest acknowledges that it "receive[s] information about [users] and [their] activity outside Pinterest" from third parties it works with for targeted advertising.[16]

36. While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, they do not provide, nor could they provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, vague descriptions of data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of the Tracking Tool Providers' surveillance networks.

37. The Tracking Tool Providers aggregate the user information that they collect from third-party websites into "advertising profiles" consisting of all of the data that they have collected

[14] Pinterest, Inc., *Annual Report (Form 10-K)*, at 4, 56 (Feb. 12, 2026), *available at:* https://www.sec.gov/Archives/edgar/data/1506293/000150629326000021/pins-20251231.htm (last visited Oct. 28, 2026).

[15] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Oct. 28, 2026).

[16] *Privacy Policy*, PINTEREST, https://policy.pinterest.com/en/privacy-policy (last visited Oct. 28, 2026); *Personalization and data*, PINTEREST, https://help.pinterest.com/en/article/personalization-and-data (last visited Oct. 28, 2026).

about a given user.[17] With these advertising profiles, the Tracking Tool Providers can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[18]

38. The surveillance of individuals' internet usage is pervasive. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[19] and Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[20]

39. Moreover, as in this case, the data collected by the Tracking Tool Providers often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[21] In fact, Google advertising trackers were found on 73-percent of pornography websites.[22]

---

[17] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[18] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Oct. 28, 2026).

[19] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Oct. 28, 2026).

[20] WhoTracksMe, Ghostery, https://www.ghostery.com/whotracksme/ (last visited Oct. 28, 2026).

[21] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[22] *Id*.

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[23]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[24] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[25]

40. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[26] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[27]

---

[23] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[24] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Oct. 28, 2026).

[25] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Oct. 28, 2026).

[26] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Oct. 28, 2026).

[27] Michael Zimmer, Mark Zuckerberg's Theory of Privacy, WASH. POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last visited Oct. 28, 2026).

41. In fact, the Tracking Tool Providers value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatuses.[28]

42. When website operators, like Defendant, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in their mass surveillance network and, in return, they benefit from the Tracking Tool Providers' collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[29]

43. Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[30] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[31]

---

[28] *See Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Oct. 28, 2026) ("Google Analytics gives you the tools, free of charge"); Meta Business Suite FAQ, META, https://www.facebook.com/business/tools/meta-business-suite/help (last visited Oct. 28, 2026) ("Meta Business Suite is a free tool"); *Get a business account*, PINTEREST, https://help.pinterest.com/en/business/article/get-a-business-account (last visited Oct. 28, 2026) ("Set up a free Pinterest business account to get access to analytics….").

[29] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Oct. 28, 2026).

[30] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[31] *Id.*

44. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[32]

**ii. Pixels Can Record Almost Every Interaction Between a User and a Website**

45. In order to use the Tracking Tool Providers' Business Tools, Defendant installed their Tracking Tools, including tracking Pixels, onto the Website.

46. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[33]

47. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information

[32] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[33] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Oct. 28, 2026).

provided by the user on an online form—all transmitted in real-time as the user navigates a website.[34]

48. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[35]

**iii. The Pixels Installed on the Website Transmit Personally Identifiable Information to the Tracking Tool Providers**

49. Every website is hosted by a computer "server" that holds the website's contents.

50. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

51. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link,

---

[34] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Oct. 28, 2026); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Oct. 28, 2026).

[35] *Lurking Beneath the Surface, supra* note 33.

and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

52. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[36] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[37] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[38]

53. When a user logs onto their Google, Facebook, or Pinterest account, their web browser records a tracking cookie.[39] These cookies include specific lines of code that links the web browser to the user's Google, Facebook, or Pinterest account, respectively.[40]

54. The Tracking Tool Providers' Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

---

[36] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Oct. 28, 2026).
[37] *Id.*
[38] *Id.*
[39] Cyphers & Gebhart, *supra* note 17.
[40] *Id.*

55. Simultaneously, the Pixels, like those installed on the Website, request identifying information from any of the Tracking Tool Providers' cookies previously installed on the user's web browser.

56. The Pixels then combine the data received from the browser with the data acquired from the cookie, and instructs the web browser to transmit the information back to the Tracking Tool Providers. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels to the user's identity, via the user's Google, Facebook, or Pinterest profile, respectively. Thus, even if a user never actually logs into a website or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

57. A remarkable number of Americans possess a Google, Facebook, or Pinterest account. One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[41] According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[42] And in 2025, Pinterest's advertising resources indicated that 96 million Americans had Pinterest accounts.[43] When these users visit a website that utilizes the Tracking Tool Providers' Pixels, like Defendant's Website, any

---

[41] *See* Harsha Kiran, *Gmail's Impact in 2025: A Comprehensive Overview*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Oct. 28, 2026) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Oct. 28, 2026); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Oct. 28, 2026).

[42] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visited Oct. 28, 2026).

[43] Simon Kemp, *Digital 2025: The United States of America*, DATAREPORTAL (Feb. 25, 2025), https://datareportal.com/reports/digital-2025-united-states-of-america (last visited Oct. 28, 2026).

information collected by the Pixels can be linked to the user's identity through the Tracking Tool Providers' cookies installed on the user's web browser.

58. However, it is not only account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have an account with the Tracking Tool Providers.

59. The Tracking Tool Providers' Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

60. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[44] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[45] And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**iv. Defendant Disclosed Plaintiff's and Class Members' Sensitive Information to the Tracking Tool Providers.**

61. To obtain Defendant's fertility and family planning services, Plaintiff and Class Members were required to utilize the Website to obtain information about Fairfax Cryobank's services and/or to search for and purchase donor sperm.

---

[44] Cyphers & Gebhart, *supra* note 17.

[45] *Id.*

62. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Information communicated through the Website to third parties, including the Tracking Tool Providers.

63. The following screenshots ("Figures 1-4") depict the network transmissions made by the Google Tracking Tools installed on the Website. The information provided in Figures 1-4 is exemplar information collected on the Website, and is not Plaintiff's information, but the Tracking Tools installed on the Website collected from Plaintiff information that in sum and substance was similar to what is shown in the Figures. As Figures 1-4 show, as prospective parents utilize the Website, the Sensitive Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website include the specific services the user is interested in (in Figure 1, e.g., "home insemination with donor sperm"), the filters the user is searching sperm donors by (in Figure 2, e.g., by height), the donor profile the user is viewing (in Figure 3, e.g., "Donor #7526"), and the fact that the user is calling Fairfax Cryobank Client Services.

64. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiff to her identity. The following screenshots show that the Google Pixel on the Website transmitted the identifier number attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account. The information is additionally transmitted along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.




*Figure 1. Exemplar screenshot depicting network traffic from the Website which shows information transmitted to Google when a Website user seeks information relating to home insemination.*



Headers | Payload | Preview | Response | Initiator | Timing | Cookies

▼ Query String Parameters View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-FPT2X35X15 |
| gtm | 45je6560v878843761za20gzb811074302zd811074302 |
| _p | 1778185098018 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| _eu | EAgAAGQC |
| _prs | ok |
| are | 1 |
| cid | 567612859.1778184550 |
| frm | 0 |
| ir | 1 |
| pscdl | noapi |
| rcb | 19 |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;147.0.3912.98\|Not.A%2FBrand;8.0.0.0\|Chromium;147.0.7727.138 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 7 |
| tag_exp | 0~115938465~115938469~116363097~117884344~118463262~118826471 |
| sid | 1778184549 |
| sct | 1 |
| seg | 1 |
| dl | https://fairfaxcryobank.com/search/searchresults.aspx |
| dr | https://fairfaxcryobank.com/search/ |
| dt | Sperm cryo banks \| Search Results |
| _tu | QA |
| en | search_results_us |
| _c | 1 |
| ep.page_query_string | |
| ep.page_hash | |
| ep.donor_id | 5'0" - 5'3" |
| tfd | 2988 |

*Figure 2. Exemplar screenshot depicting network traffic from the Website which shows information transmitted to Google when a Website user filters their sperm donor search to donors who are between 5'0" and 5'3".*

Headers | **Payload** | Preview | Response | Initiator | Timing | Cookies

**▼ Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-FPT2X35X15 |
| gtm | 45je6560v878843761z8811074302za20gzb811074302zd811074302 |
| _p | 1778185280356 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| _eu | EAAAAGQC |
| are | 1 |
| cid | 567612859.1778184550 |
| frm | 0 |
| ir | 1 |
| pscdl | noapi |
| rcb | 5 |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;147.0.3912.98\|Not.A%2FBrand;8.0.0.0\|Chromium;147.0.7727.138 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| tag_exp | 0~115938466~115938468~116363097~118463261~118494634~118719170~118851534 |
| sid | 1778184549 |
| sct | 1 |
| seg | 1 |
| dl | https://fairfaxcryobank.com/search/donorprofile.aspx?number=7526&s=1 |
| dr | https://fairfaxcryobank.com/search/donorprofile.aspx?number=7723&s=1 |
| dt | Fairfax Cryobank \| Sperm Donor #7526 |
| _tu | SA |
| _s | 3 |
| tfd | 5943 |

*Figure 3. Exemplar screenshot depicting network traffic from the Website which shows information transmitted to Google when a Website views a specific sperm donor profile.*




| | |
|---|---|
| v | 2 |
| tid | G-FPT2X35X15 |
| gtm | 45je6560v878843761z8811074302za20gzb811074302zd811074302 |
| _p | 1778184695923 |
| _gaz | 1 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| _eu | EAAAAGQC |
| are | 1 |
| cid | 567612859.1778184550 |
| frm | 0 |
| ir | 1 |
| pscdl | noapi |
| rcb | 13 |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;147.0.3912.98\|Not.A%2FBrand;8.0.0.0\|Chromium;147.0.7727.138 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 2 |
| tag_exp | 0~115616986~115938465~115938469~118289195~118463262~118494633~118947420 |
| sid | 1778184549 |
| sct | 1 |
| seg | 1 |
| dl | https://fairfaxcryobank.com/contact-us |
| dr | https://fairfaxcryobank.com/home-insemination |
| dt | Contact Us \| Fairfax Cryobank Client Services Information |
| _tu | QA |
| en | click_to_call |
| ep.page_query_string | |
| ep.page_hash | |
| ep.link_text | 8003388407 |
| _et | 3754 |
| tfd | 96091 |

*Figure 4. Screenshot depicting network traffic from the Website which shows information transmitted to Google when Website users initiate a call with Fairfax Cryobank's Client Services.*

65. The following screenshots ("Figures 5-6") depict the network transmissions made by the Facebook Tracking Tools installed on the Website. The information provided in Figures 5-6 is exemplar information collected on the Website, and is not Plaintiff's information, but the Tracking Tools installed on the Website collected from Plaintiff information that in sum and substance was similar to what is shown in the Figures. As Figures 5-6 show, as prospective parents utilize the Website, the Sensitive Information requested and contemporaneously transmitted to Facebook by the Tracking Tools installed on the Website include the fact that the user is searching for sperm donors and the fact that the user added donor sperm to their cart.

66. Further, the information that was transmitted to Facebook was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiff to her identity. The following screenshots show that the Facebook Pixel on the Website transmitted the identifier number attached to Facebook's 'fbp' cookie, which identifies the user's Facebook account. The information is additionally transmitted along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.




*Figure 5. Exemplar screenshot depicting network traffic from the Website which captures information transmitted to Facebook when a Website user searches for sperm donors, triggered by the "Search" event.*




*Figure 6. Exemplar screenshot depicting network traffic from the Website which captures information transmitted to Facebook when a Website user adds donor sperm to their cart, triggered by the "AddToCart" event.*

67. The following screenshot ("Figure 7") depicts the network transmissions made by the Pinterest Tracking Tools installed on the Website. The information provided in Figure 7 is exemplar information collected on the Website, and is not Plaintiff's information, but the Tracking Tools installed on the Website collected from Plaintiff information that in sum and substance was similar to what is shown in the Figure. As Figure 7 shows, as prospective parents utilize the Website, the Sensitive Information requested and contemporaneously transmitted to Pinterest by the Tracking Tools installed on the Website include the specific services the user is interested in.

68. Further, the information that was transmitted to Pinterest was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiff to her identity. The Pinterest Pixel on the Website transmitted the identifier number attached to Pinterest's '_pinterest_sess' and '_pinterest_ct' cookies, which identify the user's Pinterest user ID. The information is additionally transmitted along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.


```
HTTP/1.1  GET ct.pinterest.com  REQUEST

METHOD: GET +
URL
- https://ct.pinterest.com/v3/?tid=2613238442732&pd=%7B%22np%22%3A%22gtm%22%2C%22gtm_version%22%3A%22legacy%22%2C%22pin_unauth%22%3A%22dWlkPU5qTXpaRGc1TkRBdFl6U
TNaQzAwTldGakxUZzNabVF0WmpobE1XRmxOelV4TWpVMg%22%7D&event=init&ad=%7B%22loc%22%3A%22https%3A%2F%2Ffairfaxcryobank.com%2Fembryo-storage%22%2C%22ref%22%3A%22https%
3A%2F%2Ffairfaxcryobank.com%2Fsperm-storage%22%2C%22if%22%3Afalse%2C%22sh%22%3A1440%2C%22sw%22%3A2560%2C%22mh%22%3A%228bbbbe54%22%2C%22is_eu%22%3Afalse%2C%22epik
DataSource%22%3Anull%2C%22derivedEpikDataSource%22%3Anull%2C%22unauthIdDataSource%22%3A%22fpc_ls%22%2C%22architecture%22%3A%22x86%22%2C%22bitness%22%3A%2264%22%2
C%22brands%22%3A%5B%7B%22brand%22%3A%22Microsoft%20Edge%22%2C%22version%22%3A%22147%22%7D%2C%7B%22brand%22%3A%22Not.A%2FBrand%22%2C%22version%22%3A%228%22%7D%2C%
7B%22brand%22%3A%22Chromium%22%2C%22version%22%3A%22147%22%7D%5D%2C%22mobile%22%3Afalse%2C%22model%22%3A%22%22%2C%22platform%22%3A%22Windows%22%2C%22platformVers
ion%22%3A%2219.0.0%22%2C%22uaFullVersion%22%3A%22147.0.3912.98%22%2C%22ecm_enabled%22%3Atrue%7D&cb=1778184622258

Protocol: https
    Host: ct.pinterest.com
    Path: /v3/

PARAMETERS
     tid: 2613238442732
      pd: {"np":"gtm","gtm_version":"legacy","pin_unauth":"dWlkPU5qTXpaRGc1TkRBdFl6UTNaQzAwTldGakxUZzNabVF0WmpobE1XRmxOelV4TWpVMg"}
   event: init
      ad: {"loc":"https://fairfaxcryobank.com/embryo-storage","ref":"https://fairfaxcryobank.com/sperm-storage","if":false,"sh":1440,"sw":2560,"mh":"8bbbbe54","i
          s_eu":false,"epikDataSource":null,"derivedEpikDataSource":null,"unauthIdDataSource":"fpc_ls","architecture":"x86","bitness":"64","brands":[{"brand":"Mi
          crosoft Edge","version":"147"},{"brand":"Not.A/Brand","version":"8"},{"brand":"Chromium","version":"147"}],"mobile":false,"model":"","platform":"Window
          s","platformVersion":"19.0.0","uaFullVersion":"147.0.3912.98","ecm_enabled":true}
      cb: 1778184622258

HEADERS -
+ Accept:                          */*
+ Accept-Encoding:                 gzip, deflate, br, zstd
+ Accept-Language:                 en-US,en;q=0.9
  Attribution-Reporting-Eligible:  trigger=event-source
  Attribution-Reporting-Support:   web;os
+ Connection:                      keep-alive
+ Host:                            ct.pinterest.com
+ Origin:                          https://fairfaxcryobank.com
+ Referer:                         https://fairfaxcryobank.com/
  sec-ch-ua:                       "Microsoft Edge";v="147", "Not.A/Brand";v="8", "Chromium";v="147"
  sec-ch-ua-mobile:                ?0
  sec-ch-ua-platform:              "Windows"
+ Sec-Fetch-Dest:                  empty
+ Sec-Fetch-Mode:                  cors
+ Sec-Fetch-Site:                  cross-site
  Sec-Fetch-Storage-Access:        none
+ User-Agent:                      Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/147.0.0.0 Safari/537.36 Edg/147.0.0.0
```


*Figure 7. Exemplar screenshot depicting network traffic from the Website which captures information transmitted to Pinterest when a Website user obtains information relating to "embryo storage."*

69. In their default state, the Tracking Tool Providers' Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking

on an advertisement, or viewing a webpage.[46] The Pixels on the Website were purposefully configured to collect and transmit additional user data, including the specific services, specific search filters, and the profiles of donors users view and add to their favorites or cart.

70. By installing third-party Tracking Tools, including tracking Pixels, on the Website, further configuring those Pixels to collect prospective parents' Sensitive Information, and/or by directing prospective parents to communicate through the Website despite having actual or constructive knowledge of the disclosures caused by the Tracking Tools, Defendant knowingly and intentionally caused Plaintiff's and Class Members' Sensitive Information to be transmitted to third parties, including the Tracking Tool Providers.

## B. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### i. Defendant failed to inform Plaintiff and Class Members of their disclosure of Plaintiff's and Class Members' Sensitive Information

71. Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Information to third parties, including the Tracking Tool Providers.

72. Plaintiff and Class Members had a reasonable expectation of privacy that Defendant would not disclose their Sensitive Information to third parties.

73. By allowing third parties such as the Tracking Tool Providers to intercept Plaintiff's and Class Members' Sensitive Information and use it for advertising purposes without Plaintiff's and Class Members' consent, Defendant violated Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Information.

### ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members

[46] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069 (last visited Oct. 28, 2026).

74. The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Website.

75. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Information would be disclosed to any unauthorized third party without their express consent.

76. Plaintiff and Class Members did not know that their Sensitive Information was being collected and transmitted to an unauthorized third party.

77. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### i. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Information

78. As explained, *supra*, users of the Tracking Tool Providers' Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on their website.

79. Upon information and belief, Defendant, as a user of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers to collect Plaintiff's and Class Members' Sensitive Information.

**ii. Plaintiff's and Class Members' Data Had Financial Value**

80. Moreover, Plaintiff's and Class Members' Sensitive Information has value and Defendant's disclosure and interception of that Sensitive Information harmed Plaintiff and the Class.

81. According to the annual reports of Facebook, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[47]

82. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

83. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[48] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[49]

---

[47] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, WASH. POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Oct. 28, 2026).

[48] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[49] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf .

84. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

85. The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

**D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATED HIPAA**

86. The disclosure of Plaintiff's and Class Members' Private Information via the Pixels contravened the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[50]

87. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") and Personal Health Information ("PHI") that is held or transmitted by a covered entity such as Defendant.

88. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §

[50] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Oct. 28, 2026).

160.103.

89. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

90. There are 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").

91. Additionally, information revealing that an individual is receiving medical service or treatment is PHI. In its 2012 Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the U.S. Department of Health and Human Services (HHS) instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source uncoupled from health data (e.g., a phone book), "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

92. HHS has repeatedly instructed covered entities that patient status is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg.

53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

93. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, i.e., to perform analysis on data key to their operations.

94. When the information that a regulated entity collects through technologies or discloses to third parties (e.g., tracking technology vendors like Google) includes PHI, the protections under the HIPAA Privacy Rule apply.[51]

95. Put simply, HIPAA covered entities such as Defendant are not permitted to use tracking technology tools (like Pixels) in a way that exposes an individual's PHI to any third party without that individual's express and informed consent.

96. In a joint letter to approximately 130 hospital systems and telehealth provides, the Office for Civil Rights (OCR) at the HHS and Federal Trade Commission (FTC) acknowledged that tracking technology tools "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[52] Disclosures to third parties by these tracking tools can "reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[53]

97. The HHS and FTC warn that the "[i]mpermissible disclosures of an individual's

---

[51] *See Letter regarding Use of Online Tracking Technologies*, FEDERAL TRADE COMMISSION, available at: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Oct. 28, 2026).
[52] *Id.*
[53] *Id.*

[PHI] to third parties may result in a wide range of harms to an individual or others," including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[54]

98. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[55]

99. Consistent with this restriction, the HHS has issued marketing guidance that provides:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[56]

100. The HIPAA Privacy Rule further requires any "covered entity"—which includes Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

101. In contravention of HIPAA, Defendant failed to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]" 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software

---

[54] *Id.*
[55] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[56] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Oct. 28, 2026).

programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

102. Defendant failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

103. Defendant violated the Privacy Rule by providing patient information to third parties without first obtaining express consent from Plaintiff and Class Members.

## E. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATED THE TEXAS DATA PRIVACY AND SECURITY ACT

104. Numerous states have enacted comprehensive data privacy statutes that regulate some of the data collected by Defendant through the Website, including Texas.

105. Under the TDPSA, website operators like Defendant are required to:

> a. limit the collection of personal data to what is adequate, relevant, and reasonably necessary in relation to the purposes for which such data is processed, as disclosed to the consumer;
>
> b. not process personal data for a purpose that is neither reasonably necessary to, nor compatible with, the disclosed purpose for which the personal data is processed, as disclosed to the consumer, unless the controller obtains the consumer's consent; [and]
>
> c. not process sensitive data of a consumer without obtaining the consumer's consent….

Tex. Bus. Com. Code Ann. § 541.101.

106. Moreover, under the TDPSA, consent means "a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer." *Id.* § 541.001(6).

107. The TDPSA further specifies that consent may include a written statement, including by electronic means, or any other unambiguous affirmative action, but does not include:

> a. acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information;
>
> b. hovering over, muting, pausing, or closing a given piece of content; or
>
> c. agreement obtained through the use of dark patterns.

*Id.*

108. Therefore, Defendant's use of the Tracking Tools as described in this Complaint violated the TDPSA.

## F. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

109. At all times when Plaintiff and Class Members provided their Sensitive Information to Defendant, they each had a reasonable expectation that the information would

remain confidential and that Defendant would not share the Sensitive Information with third parties for a commercial purpose, unrelated to providing them with fertility services.

110. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

111. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[57]

112. Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[58] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[59]

113. Moreover, research specifically addressing reproductive-health privacy confirms that consumers have substantial concerns about the collection, use, and disclosure of sensitive

---

[57] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Oct. 28, 2026).

[58] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[59] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

information concerning their reproductive lives. One such study found that over 87-percent of respondents of child-bearing age were concerned over the disclosure and abuse of their personal information without their consent.[60]

114. Personal data privacy and obtaining consent to share Sensitive Information are material to Plaintiff and Class Members.

## V. TOLLING AND ESTOPPEL

115. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tool Providers' Tracking Tools onto the Website.

116. The Tracking Tools on the Website were and are invisible to the average website visitor.

117. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

118. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on her part.

119. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by browsing services and donors through the Website, Plaintiff's and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including the Tracking Tool Providers.

---

[60] Rachele Hendricks-Sturrup & Christine Y Lu, *An Assessment of Perspectives and Concerns Among Research Participants of Childbearing Age Regarding the Health-Relatedness of Data, Online Data Privacy, and Donating Data to Researchers: Survey Study*, 25 J. MED. INTERNET RES. e41937 (2023), *available at*: https://www.jmir.org/2023/1/e41937/ (last visited Oct. 28, 2026).

120. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

121. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

122. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

123. This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

124. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website to browse fertility services and search for and/or purchase donor sperm, and whose Sensitive Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party.

125. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of separate Texas Subclass, which is defined as follows:

**Texas Subclass**

All natural persons residing in the State of Texas, who used the Website to browse fertility services and search for and/or purchase donor sperm, and whose Sensitive

Information was disclosed or transmitted to the Tracking Tool Providers, or any other unauthorized third party.

126. The Nationwide Class and Texas Subclass are collectively referred to herein as the "Class." Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

127. Plaintiff reserves the right to amend the definitions of the Class, or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

128. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are hundreds of thousands of individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

129. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Information of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Information of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of prospective parents' Sensitive Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Sensitive Information.

130. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

131. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

132. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

133. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

134. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

135. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

136. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## VII. CAUSES OF ACTION

### COUNT I
### COMMON LAW INVASION OF PRIVACY
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

137. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or

interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiff's and Class Members' knowledge or consent, and (3) preventing the distribution of their Sensitive Information through the Tracking Tool Providers' advertising networks.

139. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

140. Plaintiff and Class Members communicated Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

141. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

142. Moreover, Defendant's knowing disclosure of Plaintiff's Sensitive Information to the Tracking Tool Providers, some of the largest advertisers in the world, to be used for advertising purposes, constitutes a publication of private facts.

143. Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

144. Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

145. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

146. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

147. Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

148. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

149. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT II**
**NEGLIGENCE**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

150. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

151. Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Information, believing such Information would be kept confidential.

152. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

153. Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

154. Defendant further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Information for marketing purposes, and/or that their Sensitive

Information would be transmitted to third parties.

155. Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

156. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

157. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

158. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT III
## BREACH OF FIDUCIARY DUTY
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

159. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

160. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendant and Plaintiff.

161. In light of the special relationship between Defendant and Plaintiff and Class

Members, whereby Defendant became guardians of Plaintiff's and Class Members' Sensitive Information, Defendant became fiduciaries by their undertaking and guardianship of the Sensitive Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

162. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with their patients and former patients, in particular, to keep secure their Sensitive Information private.

163. Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

164. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT IV
## BREACH OF CONFIDENCE
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

165. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

166. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

167. Plaintiff and Class Members had reasonable expectations of privacy in their

communications exchanged with Defendant, including communications exchanged on the Website.

168. Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Tools to disclose and transmit Plaintiff's and Class Members' Sensitive Information and the contents of their communications exchanged with Defendant to third parties, including the Tracking Tool Providers.

169. Defendant's disclosures of Plaintiff's and Class Members' Sensitive Information were made without their knowledge, consent or authorization, and were unprivileged.

170. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

171. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the provider-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

e. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Information, and

f. Defendant's actions violated the property rights Plaintiff and Class Members have in their Sensitive Information.

172. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

173. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

174. When Plaintiff and Class Members provided their Sensitive Information to Defendant in exchange for fertility-related services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without consent.

175. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

176. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Information without consent.

177. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Information to third parties like the Tracking Tool Providers.

178. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

179. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Information would be disclosed.

180. Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

181. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

182. Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

183. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for healthcare related services. Specifically, they provided their Sensitive Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

184. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

185. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Information.

186. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of patients' Sensitive Information.

187. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by their surreptitious collection and transmission of

Plaintiff's and Class Members' Sensitive Information.

188. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendant.

189. Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

190. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

191. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT VII
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
## 18 U.S.C. § 2511(1), *et seq.*
## Unauthorized Interception, Use, and Disclosure
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Texas Subclass)***

192. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

193. The ECPA protects both sending and receipt of communications.

194. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

195. The transmissions of Plaintiff's Sensitive Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

196. Electronic Communications. The transmission of Sensitive Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

197. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

198. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

199. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

200. By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

201. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as the Tracking Tool Providers.

202. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Information, including the fertility services they sought, the filters by which they searched for sperm donors, and the specific sperm donors they were interested in.

203. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

204. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

205. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

206. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

207. Defendant is not party to the communication based on their unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Information does not qualify for the party exemption.

208. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of implied contract;

c. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

d. Violations of the Texas Data Privacy & Security Act, Tex. Bus. & Com. Code Ann. § 541.001, *et seq.*

209. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Information to the Tracking Tool Providers without user authorization.

210. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Information on the Website, because they used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Information with the Tracking Tool

Providers and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Information.

211. As such, Defendant cannot viably claim any exception to ECPA liability.

212. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from their use of Plaintiff's and Class Members' Sensitive Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from their use of Plaintiff's and Class Members' Sensitive Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Information and/or the loss of privacy due to Defendant making such Sensitive Information, which Plaintiff and Class Members intended to remain private, no longer private.

213. Defendant intentionally used the wire or electronic communications to increase their profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Information for financial gain.

214. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

215. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

216. Any purported consent that Defendant may claim they received from Plaintiff and Class Members was not valid.

217. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

218. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class and Texas Subclass, and appointing Plaintiff and her Counsel to represent the Class;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and other members of the proposed Class, hereby demands a jury trial on all issues so triable.

Dated: November 18, 2026

Respectfully submitted,

*/s/ Kennedy M. Brian*
Kennedy M. Brian
OK Bar No. 34617
S.D. Tex. No. 3891171
Attorney-in-Charge
**SIRI & GLIMSTAD LLP**
101 Park Ave.,
Suite 1300, #16982799
Oklahoma City, OK 73102
Email: kbrian@sirillp.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Alyssa Tolentino*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: atolentino@sirillp.com

**pro hac vice admission anticipated*

***Attorneys for Plaintiff and the Class***